674 P.2d 1376

**S. UNIQUE, LTD., an Arizona corporation, Plaintiff-Appellant,**

v.

**GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY, a corporation; Gila River Farms, an unincorporated entity, Defendants-Appellees.**

No. 1 CA–CIV 5236.

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 8, 1983.

Reconsideration Denied Oct. 20, 1983.

Review Denied Jan. 4, 1984.

Russell Piccoli, Phoenix, for plaintiff-appellant.

Rodney B. Lewis, Sacaton, for defendants-appellees.

## OPINION

CORCORAN, Judge.

This is an appeal by the plaintiff below from the trial court's order dismissing its complaint with prejudice. The complaint was filed by the plaintiff-appellant S. Unique, Ltd., a private corporation, against the Gila River Pima-Maricopa Indian Community (Indian Corporation), which holds a Corporate Charter for business purposes under federal statute, and its alleged business enterprise known as the Gila River Farms (GRF). We are called upon to determine whether the trial court erred by applying the doctrine of tribal immunity in its ruling to bar appellant's claim. The Gila River Indian Community (Community) was not and is not a party to this litigation. The Community is the governmental organization of the tribe.

In this decision we again deal with "the unique legal status enjoyed by the Indian tribes," *Morgan v. Colorado River Indian Tribe,* 103 Ariz. 425, 428 n. 1, 443 P.2d 421, 424 n. 1 (1968), in an attempt to define "the erratic allocation of civil jurisdiction between the tribe and state which prevails in those states where the Indian tribe remains a jurisdiction unto itself." W. Canby, *Civil Jurisdiction and the Indian Reservation,* 1973 Utah L.Rev. 206.

The underlying suit was filed as a breach of contract action arising out of a business transaction which was initiated off the Indian reservation. On May 28, 1975, GRF contracted to purchase from appellant several thousand gallons of herbicide. Appellant delivered the chemical to GRF on the reservation in the summer of 1975. Thereafter, GRF was billed $177,000 and refused to pay.

A complaint was filed in superior court by appellant against the Indian Corporation and GRF. Both defendants moved to dismiss the complaint on various grounds, generally based on tribal immunity. The motions were granted and final judgments of dismissal were entered as to the Indian Corporation and GRF. Appellant appeals from these judgments.

380

This case presents three issues for decision by this court: (1) Does the superior court have jurisdiction over GRF; (2) does the superior court have jurisdiction over the Indian Corporation; (3) was service of process on the Indian Corporation insufficient?

Although we will attempt to discuss the relationship between GRF and the Community separately from the relationship of the Indian Corporation and the Community, there will be an overlap in the discussion because of the tripartite relationship.

## GILA RIVER FARMS

Whether the superior court has jurisdiction over GRF depends on whether GRF is an unincorporated entity created by and under the control of the Indian Corporation. GRF and the Indian Corporation have at all times claimed that GRF has no relation to the Indian Corporation and that it is a subordinate economic organization of the Community. Appellant has attempted to treat the Indian Corporation and the Community as amorphous entities whose functions overlap and therefore the Indian Corporation or both should be responsible for the actions of GRF.

An impressive body of law has developed recognizing the immunity of Indian tribes from suit. The basis of this immunity was recently stated by Justice Marshall in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) wherein he states:

Indian tribes have long been recognized as possessing the common law immunity from suit traditionally enjoyed by sovereign powers. . . . This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But "without congressional authorization," the "Indian Nations are exempt from suit."

436 U.S. at 58, 98 S.Ct. at 1677, 56 L.Ed.2d at 115.

■ *Arizona courts recognize the doctrine of tribal sovereign immunity. In Morgan v. Colorado River Indian Tribe, supra,* the Arizona Supreme Court held that state courts lacked jurisdiction over an Indian tribe which had allegedly committed a tort while engaged in a business enterprise within the state of Arizona but outside tribal boundaries. Our supreme court held that since the Colorado River Indian Tribe was a dependent sovereign immune from suit, it could not be subjected to the jurisdiction of Arizona courts without its consent or the consent of Congress.

Similarly, in a breach of contract suit, a subordinate business enterprise of an Indian tribe was found to be immune from suit in the courts of Arizona. *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971). Justice Hays stated there:

We believe it would defeat the purpose of Congress in granting immunity to Indian Tribes were we to treat a subordinate economic organization of an Indian tribe as governmental corporations or federal instrumentalities are treated. If it is the intent of Congress that such organizations be treated as governmental corporations or federal instrumentalities it is a matter best left to Congress for action. . . . [R]espondent . . . takes the position that since FATCO [Fort Apache Timber Company, the subordinate economic organization] was created for commerical purposes as opposed to governmental purposes it should not be immune from suit. In *Maryland Cas. Co. v. Citizens Nat. Bank of West Hollywood*, 361 F.2d 517 (5th Cir.1966) the court held that the fact that the tribe in that case "was engaged in an enterprise, private or commercial in character, rather than governmental, is not material. It is in such enterprises and transactions that the Indian tribes and the Indians need protection." 361 F.2d at page 521. We reached a similar conclusion in *Morgan v. Colorado River Indian Tribe, supra.*

107 Ariz. at 7, 480 P.2d at 657. Thus, if GRF is a subordinate economic organization of the Community, the governmental organization of the Tribe, it could not be sued by appellant in the Superior Court of Arizona, absent the express consent of the Community or Congress.

The Community has the authority to create subordinate organizations for economic purposes. *See* Article XV, Section 1, subparagraph (b)(6), Constitution and By-laws of the Community. It is apparent that GRF is such a subordinate economic organization. This conclusion is supported by the provisions of the "Plan of Operation" of GRF. According to the plan, GRF was created by the Community for the following purposes:

> The purpose of the Farm [GRF] shall be to promote the economic development of the Gila River Indian Community and its members through utilization of the Community's agricultural resources; to provide business training to the governing body of the Community and other members; to make a satisfactory profit for the Community and to supply employment opportunities for members of the Community consistent with making a satisfactory profit.

It is appellant's position that GRF is not protected from suit through tribal immunity because GRF is a separate and distinct business enterprise and because an exercise of jurisdiction would not interfere with tribal self-government. This position is not supported by the Plan of Operation. The following passages from the Plan make it clear that GRF is an integral part of the Community. "Any lands set aside for the Farm [GRF] that may become surplus to its needs shall, upon recommendation of the Farm Board and a duly adopted resolution of the Community Council, revert to the Community at which time the [Community] Council may determine the future use of said lands"; "the general business policies and procedures of the Farm shall be determined by a Farm Board composed of three members and shall function as an extension of the [Community] Council. It shall be a technical advisory board and shall be charged with the following responsibilities: ... (c) [r]epresenting the Community in all matters ... (g) [p]erforming other duties and responsibilities as delegated by the [Community] Council; [a]rrangements satisfactory to the [Community] Council will be made with the bank or banks ...; [a]ll

records and files of the Farm are property of the Community and shall be kept in the Farm offices; [t]itle to all property purchased or acquired by the Farm shall be taken in the name of the Gila River Indian Community unrestricted."

In *Shelley, supra,* our Supreme Court found that similar provisions in the "Plan of Operation" for the Fort Apache Timber Company (FATCO) were sufficient to establish that that business enterprise was not independent from the Tribe but was in fact part of the Tribe. We concur with the trial court that GRF is a subordinate economic organization of the Community and that GRF, as a business unit, is not separate and distinct from the Community.

Accordingly, we find that GRF cannot be sued as an independent party, since any claim against GRF must be established in a suit against the Community. GRF could claim tribal immunity, and its motion to dismiss was properly granted.

## GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY

Before discussing the relationship between the Community, the governmental organization of the Tribe, and the Indian Corporation, we must first briefly review the relevant federal law.

In 1934, Congress approved the Indian Reorganization (Wheeler-Howard) Act (Act). The Act includes section 16, 25 U.S.C. § 476, allowing the tribes to *organize for governmental purposes.* That section reads in pertinent part as follows:

> Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws ... In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent

the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State and Local governments. . . .

The Act also includes in section 17, 25 U.S.C. § 477, a provision designed to permit Indian tribes to *incorporate for business or commercial purposes.* Section 17 reads in pertinent part as follows:

The Secretary of the Interior may, upon petition of at least one-third of the adult Indians, issue a charter of incorporation to such tribe. . . . Such charter may convey to the incorporating tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and other such further powers as may be incidental to the conduct of corporate business . . . .

This section does not provide by its terms that any tribe incorporated pursuant to it can automatically be sued in a state court.

The Corporate Charter of the Indian Corporation (ratified February 28, 1938) was adopted in response to the invitation found in section 17 of the Act. Section 1 of the Corporate Charter sets forth the purpose of the corporation as follows:

In order to further the economic development of the Gila River Pima-Maricopa Indian Community of the Gila River Reservation in Arizona by conferring upon the said Community certain corporate rights, powers, privileges and immunities; to secure for the members of the Community an assured economic independence; and to provide for the proper exercise by the Community of various functions heretofore performed by the Department of the Interior, the aforesaid Community is hereby chartered as a body politic and corporate of the United States of America, under the corporate name "The Gila River Pima-Maricopa Indian Community."

Section 5(i) of the Corporate Charter sets forth the powers of the corporation, including a "sue and be sued" clause, and states, in part:

The Community [Indian Corporation] . . . shall have the following corporate powers

. . . .

. . . .

(i) To sue and be sued in courts of competent jurisdiction within the United States; but the grant or exercise of such power to sue and be sued shall not be deemed a consent by the said Community [Indian Corporation] or by the United States to the levy of any judgment, lien or attachments upon the property of the Community [Indian Corporation] other than income or chattels especially pledged or assigned.

█ The Community adopted a Constitution and Bylaws (approved March 17, 1960) pursuant to section 16 of the Act. In the Preamble, it states:

We, the people of the Gila River Indian Reservation, in order to show our gratitude to Almighty God, and to preserve in ourselves the rights of self government and to provide a means for the orderly transaction of community business and the free expression of the community will, do ordain and establish this Constitution and Bylaws for the government of the people of this reservation, henceforth to be known as the Gila River Indian Community.

As can be seen, some confusion results from the use of the identifying word "Community" in both the Corporate Charter under section 17 and the Constitution and Bylaws under section 16. The Community's Constitution and Bylaws deal with establishing the structure and functions of the tribal government and empower the Community Council to create and operate subordinate economic organizations, such as GRF. The Constitution and Bylaws do *not* contain a "sue and be sued" clause. The Corporate Charter of the Indian Corporation authorizes it to enter into business ventures. The threshold question which must be answered is whether the "sue and be sued" clause in

the corporate charter of the Indian Corporation has any application to this case. We note that Arizona recognizes the principle that an Indian tribe can validly consent to the exercise of state court jurisdiction. *Shelley, supra; Morgan, supra; see Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). "The question·is the extent to which ... [tribal] ... immunity was waived." *Namekagon Dev. Co. v. Bois Forte Res. Hous. Auth.,* 517 F.2d 508, 510 (8th Cir.1975).

■ In making this determination, any waiver of immunity is to be interpreted liberally in favor of the Tribe and restrictively against the claimant. *Maryland Casualty Co. v. Citizens National Bank,* 361 F.2d 517, 521 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966).

GRF and the Indian Corporation assert that we need not reach the question of the effect of the "sue and be sued" clause on the Community's sovereign immunity because the clause is part of the Corporate Charter of the Indian Corporation, and is not contained in the Constitution and Bylaws of the Community. They further argue that the tribal organization under the Act is bifurcated—the governmental aspects being treated under section 16 and the commercial or corporate aspects being treated under section 17.

The Department of Interior recognizes that section 16 governments and section 17 corporations are different entities. Opinion No. M–36515, *Request for Interpretative Opinion on the Separability of Tribal Organizations Organized under Section 16 and 17 of the Indian Reorganization Act,* 65 I.D. 483 (1958). This opinion is relevant to the issue at bar. The Commissioner of Indian Affairs had requested an opinion as to whether an Indian tribe organized pursuant to section 16 of the Act was the same legal entity as the tribal corporation chartered pursuant to section 17. The Solicitor discussed the legislative history of the Act which, he asserted, "makes clear the distinction between the organization of an Indian municipal government under section 16 ... and that of a business corporation under

section 17 of the act." The Solicitor concluded:

The purpose of Congress in enacting section 16 of the Indian Reorganization Act was to facilitate and to stabilize the tribal organization of Indians residing on the same reservation, for their common welfare. It provided their political organization. The purpose of Congress in enacting section 17 of the Indian Reorganization Act was to empower the Secretary to issue a charter of business incorporation to such tribes to enable them to conduct business through this modern device, which charter cannot be revoked or surrendered except by act of Congress. This corporation, although composed of the same members as the political body, is to be a separate entity, and thus more capable of obtaining credit and otherwise expediting the business of the tribe, while removing the possibility of federal liability for activities of that nature. As a result, the powers, privileges and responsibilities of these tribal organizations materially differ.

65 I.D. at 484.

The Alaska Supreme Court's decision in *Atkinson v. Haldane,* 569 P.2d 151 (Alaska 1977), stands out as a well reasoned and thoughtful analysis in this area where there is a paucity of decisional authority. The court in *Haldane* concluded:

In our view, the section 16 governmental unit and the section 17 corporate unit are distinct legal entities.... The legislative history of the Indian Reorganization Act also supports a determination of separateness. Additionally, we think a construction which recognizes two legal entities would be indicated by considerations of sound public policy. There is little doubt that the claims to sovereign immunity have been allowed in the courts in order to protect the limited and irreplaceable resources of the Indian tribes from large judgments. However, strict application of the immunity principle could severely retard the tribe's economic growth in a modern business world. Recognition of two legal entities, one with

sovereign immunity, the other with the possibility for waiver of that immunity, would enable the tribes to make maximum use of their property. The property of the corporation would be at risk, presumably in an amount necessary to satisfy those with whom the tribe deals in economic spheres. Yet some of the tribal property could be kept in reserve, safe from a judgment execution which could destroy the tribe's livelihood, in recognition of the special status of the Indian Tribe.

Having determined that section 16 governmental units and section 17 corporations are separate legal entities, it must be determined which aspect is involved in the litigation that is the subject of the suit involved in this petition.

569 P.2d at 174–75.

■ Appellant argues that even if there is a distinction between the Community and the Indian Corporation, the commercial nature of GRF operations is dispositive evidence that GRF should be considered as a subsidiary or agent of the Indian Corporation and subject to suit pursuant to the "sue and be sued" clause in the Corporate Charter. We do not agree. The distinction to be made is not between commercial and governmental functions in order to determine the availability of the defense of tribal sovereign immunity. The fact that the Community was engaged in a proprietary function through the auspices of GRF is immaterial. The Community as the governmental organization of the tribe can, and in this case did, operate a commercial farming venture in GRF as a subordinate economic organization of the Community. This does not waive tribal sovereign immunity. *Morgan, supra.* As the Fifth Circuit said in *Maryland Casualty Co. v. Citizens National Bank, supra:*

The fact that the Seminole Tribe was engaged in an enterprise private or commercial in character, rather than governmental, is not material. It is in such enterprises and transactions that the Indian tribes and the Indians need protection.

361 F.2d at 521; *Morgan,* 103 Ariz. at 428, 443 P.2d at 424.

The Department of Interior has recognized that a tribal governmental organization (like the Community) may have broad economic powers:

Ordinarily it is safe to assume that a transaction of a so-called "organized tribe" is a transaction of the tribal municipal corporation [acting pursuant to section 16], *which may have as broad or broader economic powers as its business corporation counterpart* [acting pursuant to section 17]. *Unless* documentary evidence such as a conveyance to the business corporation or contractual agreement, by resolution or otherwise, gives the business corporation an agency or proprietary relationship to certain property, it can be assumed that the corporation is not directly involved.

*Timber as a Capital Asset of the Blackfeet Tribe,* Opinion No. M–36545 (Dec. 16, 1958) (emphasis added). The record in this case reveals no evidence that the land and assets allocated to GRF by the Community were ever specifically conveyed or set aside to the Indian Corporation. Indeed, Tribal Governor Alexander M. Lewis, Sr., testified that the Indian Corporation itself has no separate officers, no separate directors, no separate bank accounts, no separate assets, and no separate property holdings. In short, the Indian Corporation is a shell. The Indian Corporation as defined in the Corporate Charter has no agency or proprietary relationship to the assets of the Community or GRF. We, therefore, conclude that GRF is a subordinate business organization of the Community acting under its Constitution and Bylaws pursuant to section 16, and is unrelated to the Indian Corporation acting as a business corporation pursuant to the Corporate Charter and section 17. Therefore, we cannot assume that the activities of GRF are related to the Indian Corporation.

We find that the "sue and be sued" clause contained in the Corporate Charter has application only to transactions where the Indian Corporation is clearly acting in its ca-

pacity as a business corporation pursuant to section 17 and does not apply to the Community's operation of GRF as a subordinate economic enterprise as provided for in the Community's Constitution and Bylaws. Since appellant has brought the Indian Corporation into this litigation, we must determine the effect of the "sue and be sued" clause in its Corporate Charter.

The Indian Corporation recognizes that it may be sued "in courts of competent jurisdiction" but asserts that the tribal court and not the courts of the State of Arizona are the courts of competent jurisdiction. The Indian Corporation cites *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) as authority for this proposition. In *Williams,* a non-Indian proprietor of a trading post on a Navajo reservation in Arizona sued an Indian couple in the Superior Court of Arizona to collect for goods sold to them on credit. The Arizona courts rejected the defendants' contention that exclusive jurisdiction lay in the tribal court. The Supreme Court of the United States reviewed its prior decisions that state laws "have no force" in Indian territory and reversed. The Court then observed:

> Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy .... has remained .... Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.

358 U.S. at 219–20, 79 S.Ct. at 270–71, 3 L.Ed.2d at 253–254.

It should be noted that the waiver in the "sue and be sued" clause provides that suit may be brought "in courts of competent jurisdiction within the United States" and does not require that suit be brought in the tribal court of the community. It is clear that both federal courts, *Namekagon Dev. Co. v. Bois Forte Res. House Auth., supra; Maryland Casualty Co. v. Citizens National Bank, supra,* and state courts, *Atkinson v.*

*Haldane, supra; Martinez v. Southern Ute Tribe,* 150 Colo. 504, 374 P.2d 691 (1962), have assumed jurisdiction not only to determine the issue of jurisdiction but to make determinations on the merits.

■ *Williams v. Lee, supra,* does not prohibit the Superior Court from exercising jurisdiction in this case. Section 17 of the Act authorized the Secretary of Interior to issue the corporate charter containing section 5(i), the "sue and be sued" clause. The Superior Court of Arizona is a court of competent jurisdiction in which the complaint against the Indian Corporation by appellant can be litigated.

■ The Indian Corporation further asserts that "the waiver of sovereign immunity is limited to only those situations where specific income or chattel are pledged or assigned. The complaint does not indicate any specific income or chattel which can be levied upon because no income or chattel has been specially pledged or assigned." We do not find any authority which supports this assertion. We interpret section 5(i) of the Corporate Charter as (1) waiving immunity from suit, but (2) limiting any enforcement of any resulting judgment to "income or chattels especially pledged or assigned." The "sue and be sued" clause effectively waives immunity, *FHA v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724, 728 (1940); *May Dept. Stores Co. v. Williamson,* 549 F.2d 1147, 1148 (8th Cir. 1977), and has made the Indian Corporation amenable to a state court in any action in which the court would otherwise have jurisdiction. *Martinez v. Southern Ute Tribe,* 150 Colo. at 510, 374 P.2d at 694 (1962). The clause of section 5(i) dealing with the enforcement of any judgment does not relate to the jurisdiction of the court over the Indian Corporation, but only to the enforcement of any resulting judgment.

In *Maryland Casualty Co. v. Citizens Nat'l Bank, supra,* a judgment had been taken against the Seminole Tribe pursuant to a "sue and be sued" clause similar to section 5(i) and the issue was whether the judgment creditor could garnish the funds of the tribe to satisfy the judgment. The Court of Appeals held that garnishment

was akin to attachment and therefore was precluded as a remedy since it did not involve income or chattels specially pledged or assigned. 361 F.2d at 521.

It does not appear on the record before us that appellant claims that there was "income or chattels specially pledged or assigned." However, this does not affect our conclusion that the Indian Corporation has waived its immunity and conferred jurisdiction on the courts of this state, even in a situation where any resulting judgment may be for all practical purposes unenforceable.

Although we find on the record that the trial court was justified in dismissing the complaint against GRF because it was a subordinate economic organization of the Community and therefore immune from suit, it would have been error to dismiss the complaint against the Indian Corporation because it had waived its claim of immunity. The conclusion that any remedy appellant may have is illusory because of the limitation on the enforcement of any judgment does not affect the jurisdiction of the court over the Indian Corporation. We realize that the factual basis developed and presented by the parties relating to the motions to dismiss may be the same as that which may be presented on motions for summary judgment or trial regarding the claim of liability against the Indian Corporation. However, we are limited in this appeal to a review of the propriety of the trial court's judgment which granted the Indian Corporation's motion to dismiss.

Although we find that the Indian Corporation waived immunity and therefore was amenable to suit in the Superior Court, we must determine whether there was any other ground which would justify the trial court in granting the Indian Corporation's motion to dismiss.

## SUFFICIENCY OF SERVICE OF PROCESS

■ We must, therefore, address the Indian Corporation's motion to dismiss on the ground that service of process was insufficient. See Rule 12(b)(5), Arizona Rules of Civil Procedure. The Affidavit of Service of Process by a Private Person indicates that a copy of the summons and complaint was left with the Lieutenant Governor at Sacaton on the Gila River Indian Reservation. The affidavit indicates that the process server was appointed by the Superior Court and that service was effected pursuant to rule 4(d)(1). Presumably the private process server was appointed pursuant to A.R.S. § 11–445(F) and rule 4(c). As part of its motion to dismiss the complaint, the Indian corporation alleged that the service of process was insufficient, citing *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976).

■ Appellant attached to its response to the motion an affidavit of a clerk employed by its attorneys indicating that he contacted by telephone a named person at the Gila River Community Courthouse at Sacaton and was informed that service of process upon the Indian Corporation would be properly effected by mailing the summons and complaint to the courthouse at its post office box. The clerk's affidavit stated that he sent through the mail copies of the summons and complaint directed to the Indian Corporation in accordance with this information. The affidavit does not make any reference to registered or certified mail. As to this second purported service, we find that the affidavit of the clerk is neither sufficient to determine the method by which service of process may be effected on an Indian reservation nor a satisfactory showing of compliance, and therefore reject it.

Appellant does not argue that the status of the private process server was any different than that of the Sheriff in *Francisco*. We therefore follow *Francisco* and affirm the dismissal of the complaint against the Indian Corporation for insufficiency of service of process. Rule 12(b)(5).

■ Because of the doctrine of tribal immunity, businesses that deal with Indian

tribes do so at great financial risk. In this case appellant could only have protected itself by investigating the Community's Constitution and Bylaws, by investigating GRF's Plan of Operation and by investigating the Indian Corporation's Corporate Charter. This investigation would have revealed the fact that GRF was not a subsidiary of the Indian Corporation but, rather, was a subordinate economic organization of the Community acting under its Constitution and Bylaws, and as such, was entitled to tribal immunity. Confronted with this fact, appellant only then could have taken steps to protect its interests.

The judgments of dismissal are affirmed.

CONTRERAS, P.J., and OGG, J., concur.