807 P.2d 1111

**Tony BEGAY, Petitioner–Appellant,**

**v.**

**Honorable Donald G. ROBERTS, Justice of the Peace, Page Precinct, County of Coconino, Small Claims Division, Respondent–Appellee,**

**Richard SPECHT, dba Sandland Motors, Real Party in Interest–Appellee,**

**Salt River Project, Garnishee, Defendant–Appellee.**

**No. 1 CA–CV 89–454.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 13, 1990.

Petition and Cross–Petition for Review Denied April 23, 1991.*

* Cameron, J., of the Supreme Court, voted to grant review.

DNA–People's Legal Services, Inc. by Otto H. Van Maerssen, Catherine M. Van Maerssen, Tuba City, for petitioner-appellant.

Aspey, Watkins & Diesel by Bruce S. Griffen, Wendy F. White, Flagstaff, for real party in interest-appellee Richard Specht.

Yvonne Hunter, Phoenix, for garnishee, defendant-appellee Salt River Project.

## OPINION

GRANT, Chief Judge.

This case raises the question of whether Arizona courts have jurisdiction to garnish wages payable to an Indian living and working on a reservation. In a special action, the Coconino County Superior Court upheld the justice court's jurisdiction to issue two writs of garnishment against appellee/garnishee Salt River Project. For the reasons explained below, we conclude there was no jurisdiction to issue the writs of garnishment. However, we uphold the

justice court's personal jurisdiction over defendant/appellant Tony Begay in the underlying action.

The facts and procedural background leading up to the writs of garnishment are not in dispute. Tony Begay is a Navajo Indian residing on the Navajo Indian Reservation in Arizona. At the time of these proceedings, he worked for the Salt River Project (SRP) on the reservation.

Begay purchased an automobile from appellee Richard Specht dba Sandland Motors (Specht) in Page, Arizona, which is off the reservation. Pursuant to the terms of the sales agreement, Begay agreed to make monthly payments of $150. After Begay failed to make any payments, Specht filed an action (Case No. 1202 SC) in the Page Precinct Justice of the Peace Court, Small Claims Division, seeking $450. Begay was served by registered mail, and thereafter answered that the court had neither subject-matter nor personal jurisdiction, and that the action should have been filed in Navajo Tribal Court. Begay nevertheless appeared for trial on December 16, 1987, and judgment in the amount of $450, plus costs and interest, was entered in favor of Specht. It is not clear from the justice court record whether Begay defended the action on the merits or merely entered a special appearance for the purpose of contesting jurisdiction.

Specht subsequently filed a second action in the same court (Case No. 1308 SC), seeking $300 for additional payments that Begay allegedly failed to make. Begay was again served by registered mail. This time Begay answered that the claim was barred by *res judicata* because of the previous judgment, that the contract violated the Federal Truth in Lending Act, and that Specht was wrongfully withholding personal property worth $600 as security for the sale. A second trial was held on February 17, 1988, at which Begay failed to appear. Judgment was entered in favor of Specht for $300, plus costs and interest.

Specht then had writs of garnishment issued on each of the judgments against Begay's employer, SRP. The writ of garnishment for Case No. 1202 SC was served on SRP at the Financial Center in Page, Arizona, which is on the reservation. The writ for Case No. 1308 SC was served on SRP in an office in back of a Circle K store in Page, Arizona, which is off the reservation. SRP answered both writs and acknowledged that Begay was an SRP employee. Copies of the writs of garnishment, notices to judgment debtor, and requests for hearing were mailed to Begay, as required by A.R.S. § 12–1598.04(D). Begay requested hearings in both cases, claiming that his wages were not subject to wage assignment because they were earned on the reservation.

After the justice court denied Begay's requests to quash the writs, Begay filed a special action in Coconino County Superior Court on the grounds that the justice court did not have jurisdiction to issue the writs of garnishment, and that service of the original complaints was improper. Specht's subsequent motion to dismiss the special action was granted on April 18, 1989. Formal judgment was entered on June 19, 1989, and Begay timely appealed.

Begay makes three arguments on appeal:

(1) Arizona courts lack jurisdiction to garnish the wages of an Indian who lives and works on a reservation.

(2) Service of process by registered mail did not confer personal jurisdiction over Begay in the underlying actions.

(3) Begay did not waive his objection to personal jurisdiction.

In light of our disposition of the second issue, it is unnecessary to address the third. We turn to the first issue.

## JURISDICTION TO ISSUE WRITS OF GARNISHMENT

■ Begay argues that although the justice court may have had jurisdiction to enter the judgments against him, it did not have jurisdiction to garnish his wages because he lives and works on the Navajo Reservation. Whether the justice court had personal jurisdiction over the garnishee, SRP, or *quasi in rem* jurisdiction over the wages, is therefore irrelevant. Specht, on the other hand, maintains that

because Begay's wages are issued off the reservation, the justice court had jurisdiction to garnish them.

Although Begay objected to the complaint in Case No. 1202 SC on the grounds that the justice court did not have subject-matter jurisdiction, he has apparently abandoned this argument.[1] It is undisputed that the transaction resulting in the two actions—Begay's purchase of an automobile—occurred off the reservation with a non-Indian, Specht. We therefore assume that the justice court had subject-matter jurisdiction over the underlying actions, *see Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 (1973); *Smith Plumbing Co. v. Aetna Casualty & Sur. Co.*, 149 Ariz. 524, 530–31, 720 P.2d 499, 505–06 (1986), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986), and that for purposes of this discussion, the underlying judgments from which the writs of garnishment were issued, subject to our analysis of the second issue addressed in this opinion, are valid.

■ Under Arizona law, the justice court clearly had jurisdiction to issue the writs of garnishment against SRP. SRP is a political subdivision of the State of Arizona, with offices statewide and its main office in Phoenix, thus subjecting it to the personal jurisdiction of Arizona courts. SRP was personally served in both cases. *See San Fernando Motors, Inc. v. Fowler*, 17 Ariz.App. 357, 498 P.2d 169 (1972). Moreover, as a general rule, wages can be garnished in the forum where the employee could sue for them. *Weitzel v. Weitzel*, 27 Ariz. 117, 122–23, 230 P. 1106, 1107 (1924). Finally, because SRP presumably has bank accounts in Arizona, these accounts alone would be sufficient for the courts to acquire *quasi in rem* jurisdiction over the garnishment proceedings, assuming the underlying judgments were valid. *See Huggins v. Deinhard*, 134 Ariz. 98, 103, 654 P.2d 32, 37 (App.1982).

■ Because Begay is a Navajo Indian living and working on the reservation, however, this case cannot be decided without considering the Indian law implications. The fact that the transaction resulting in the underlying actions occurred off the reservation does not eliminate these implications, although it may be a factor to consider.

The United States Supreme Court has stated that "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367, 1370 (1945). From the concept that Indian nations are distinct political communities with territorial boundaries within which they have exclusive authority, guaranteed by the United States, *see Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483, 499 (1832), grew the principle that Indian nations are sovereign nations, separate but dependent on the United States. *See generally McClanahan v. State Tax Comm'n*, 411 U.S. 164, 168–69, 93 S.Ct. 1257, 1260–61, 36 L.Ed.2d 129, 133–34 (1973). In recognition of their sovereignty, "[t]he [United States] Supreme Court has repeatedly recognized that tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on the reservation." *Smith Plumbing Co.*, 149 Ariz. at 529, 720 P.2d at 504 (1986) (quoting *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1415–16 (9th Cir.1986), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986)), *cert. denied*, 479 U.S. 987 (1986).

■ Indian sovereignty is not, however, absolute. *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 591 (9th Cir. 1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984). As a result, the analysis in cases concerning questions of Indian sovereignty has moved away from the general concept of sovereignty

---

1. Begay did not raise the question of subject-matter jurisdiction in the second action, Case No. 1308 SC. He still asserts that the justice court lacked personal jurisdiction over him in both actions because the service of process was ineffective. This is the subject of the second issue addressed in this opinion.

alone to a more specific analysis based on the treaties and statutes which define the limits of state power with regard to tribal sovereignty. *McClanahan v. State Tax Comm'n*, 411 U.S. at 172, 93 S.Ct. at 1262. Our supreme court has also stated that "[a]lthough a pre-emption analysis begins with whether specific congressional acts govern a given state action, it ultimately amounts to whether Indian self-government is implicated." *Smith Plumbing Co. v. Aetna Casualty & Sur. Co.*, 149 Ariz. at 529, 720 P.2d at 504. Thus, the ultimate question is whether the exercise of state court jurisdiction in a given case will "frustrate federal policy or violate traditional notions of tribal sovereignty." *Id.*

The Navajo Treaty of 1868 first set forth the concept of the Navajo Tribe as a sovereign entity and that, within the reservation, it possesses the right of self-government. *See Joe v. Marcum*, 621 F.2d 358, 361 (10th Cir.1980). The Navajo Tribe has accordingly created a system of self-government, including a judicial branch consisting of trial and appellate courts, and has enacted the Navajo Tribal Code. *Id.* The Navajo Treaty has been consistently interpreted to preclude state court jurisdiction over Navajos living on the reservation. *McClanahan v. State Tax Comm'n*, 411 U.S. at 175, 93 S.Ct. at 1264. In accordance with this treaty, Arizona's entry into the United States was expressly conditioned on its promise to disclaim any right or title to rights or lands held by Indian tribes in Arizona, in the Arizona Enabling Act, Act of June 20, 1910, Pub.L. No. 61–219, § 20, 36 Stat. 557, 569. *See McClanahan v. State Tax Comm'n*, 411 U.S. at 175, 93 S.Ct. at 1264; *see also* Ariz.Const. art. 20, § 4.

Examples of the restrictions on state court jurisdiction in actions involving reservation Indians abound. One example is *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), in which the Supreme Court held that a reservation Indian could not be sued in state court by a non-Indian trading post proprietor over a debt allegedly owed from sales at a reservation store. The Court concluded that the Indian tribe had a powerful interest in adjudicating disputes between Indians and non-Indians doing business on Indian land. Thus, in situations where non-Indians participate and intrude on reservation affairs, the state has a relatively weak interest. *Id.*

However, "[a]s the activity in question moves off the reservation the state's governmental and regulatory interest increases dramatically, and federal protectiveness of Indian sovereignty lessens." *Smith Plumbing Co. v. Aetna Casualty & Sur. Co.*, 149 Ariz. at 530, 720 P.2d at 505 (citing *Organized Village of Kake v. Egan*, 369 U.S. 60, 75, 82 S.Ct. 562, 571, 7 L.Ed.2d 573, 583 (1962)); *see also Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Thus, in *Smith Plumbing*, the court held that where the tribe had purchased supplies from a company off the reservation which had not conducted business on the reservation, "the Tribe's reaching out outside the confines of the reservation to engage in commercial activity—without the concomitant reaching in by non-Indians—makes this a proper instance of nondiscriminatory adjudication of a contract claim by the courts of this state." 149 Ariz. at 531, 720 P.2d at 506.

The foregoing leaves little doubt that the justice court had subject-matter jurisdiction over the underlying actions in this case, where Begay, a reservation Indian, went off the reservation to purchase an automobile from a non-Indian who did not do business on the reservation. The garnishment, however, involves additional considerations because the garnished wages were earned by an Indian while living and working on the reservation for a company doing business on the reservation.

A similar, though not identical, factual situation was presented in a Tenth Circuit case, *Joe v. Marcum*, 621 F.2d 358 (10th Cir.1980). There, a Navajo Indian, Joe, residing on the reservation in New Mexico borrowed money off the reservation in Farmington, New Mexico. The lender filed a breach of contract action against Joe in New Mexico state court, which resulted in a default judgment, the validity of which was not later questioned. Joe worked for Utah International, Inc., a Delaware corpo-

ration qualified to do business in New Mexico, which operated a strip mine and maintained its offices on the reservation. At the lender's request, the New Mexico court issued a writ of garnishment against Utah International, which was served on the reservation. Joe then challenged the New Mexico court's jurisdiction to issue the writ of garnishment.

In concluding that state court jurisdiction of the attempted garnishment was preempted, the Tenth Circuit first noted that although the Navajo Tribal Code permitted enforcement of judgments by execution upon specific property owned by judgment debtors, it did not provide for the garnishment of wages. *Id.* at 361. The court then pointed out that garnishment is a statutory remedy permitted in some, but not all, jurisdictions. It concluded:

> [A] sovereign entity such as the Navajo tribe need not provide garnishment, if it so chooses. As indicated, such is the Navajo policy, as the tribal code does not provide for garnishment, although it does provide other means of enforcing judgments. Under such circumstances, to permit a state court of New Mexico to run a garnishment against Utah International, on the reservation, and attach wages earned by Joe for on-reservation labor, would thwart the Navajo policy *not* to allow garnishment. Such impinges upon tribal sovereignty, and runs counter to the letter and spirit of the Navajo Treaty of 1868, the New Mexico Enabling Act, and other applicable federal statutes.

*Id.* at 361–62 (emphasis in original).

Specht argues that *Joe* is not dispositive of this case because in *Joe* the garnishee was located exclusively on the reservation, whereas in this case, SRP operates statewide, and is clearly subject to personal jurisdiction of Arizona state courts. Indeed, in its discussion in response to the lender's argument that the New Mexico courts had jurisdiction over the garnishment simply because they had jurisdiction over the underlying action, the Tenth Circuit stated:

Garnishment proceedings are indeed ancillary proceedings in the sense that they are in aid of a judgment previously obtained. However, such are independent proceedings in the sense that they are against the judgment debtor's employer, to attach wages held by the employer and due the judgment debtor. The subject matter of the present garnishment proceedings is money held by Utah International and due Joe. Utah International was served on the reservation. The garnishment *res* is located on the reservation and represents wages due for services rendered by Joe to Utah International on the reservation. Under such circumstances, to uphold the present garnishment would thwart the Navajo policy which does not permit garnishment of wages.

*Id.* at 362–63; *see also Annis v. Dewey County Bank,* 335 F.Supp. 133, 136 (D.S.D. 1971).

We do not believe this distinction affects the result that the garnishment of a reservation Indian's wages *earned* on the reservation is preempted and infringes on Navajo tribal sovereignty. Even though the garnishment in this case may take place physically off the reservation, as opposed to *Joe,* the effect of the garnishment will be felt by Begay *on* the reservation. In this regard, the Navajo Tribe has enacted laws concerning the enforcement of judgments, which do not include garnishing wages. To allow a state court to garnish a tribal member's wages earned on the reservation would thwart the Navajo Tribe's authority to not allow garnishments of this sort. *See Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587 (holding a non-Indian off the reservation could not repossess a reservation Indian's automobile, contrary to Navajo law requiring the Indian's consent to repossession).

To the extent that the garnishment will reduce Begay's income, it can clearly threaten or have a direct effect on the "health or welfare of the tribe." *Montana v. United States,* 450 U.S. 544, 566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493, 511, *reh'g denied,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *see also Moe v. Confed-*

*erated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (holding that the state could not collect sales tax from non-Indian retailers on the reservation because of the burden upon Indians and their on-reservation activities); *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d at 593 (holding that because of the size of the Navajo Reservation, repossession of an automobile "has the potential to leave a tribal member stranded miles from his or her nearest neighbor"). This concern on the part of the Navajo Tribe may have prompted its decision not to provide for the garnishment of wages.

It is unclear from the record where Begay's paychecks are actually issued; however, he is most likely paid *on* the reservation, even though the checks may be issued off the reservation.[2] In *McClanahan*, the United States Supreme Court held that Arizona could not collect personal income tax from a reservation Indian whose entire income was derived from reservation sources. 411 U.S. at 165, 93 S.Ct. at 1259. The court noted: "Since appellant is an Indian and since her income is derived wholly from reservation sources, her activity is totally within the sphere which the relevant treaty and statutes leave for the Federal Government and for the Indians themselves." *Id.* at 179–80, 93 S.Ct. at 1266–67. The same can be said in this case where the subject of the garnishment, Begay's income, also derives from reservation sources.

We note, finally, that this garnishment would affect only Begay, as opposed to the Navajo Tribe as a whole, is irrelevant. The *McClanahan* court declared:

To be sure, when Congress has legislated on Indian matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights. This Court has therefore held that the "question has always been whether the state action infringed on the right of *reserva-*

*tion Indians* to make their own laws and be ruled by them." ... In this case, appellant's rights as a reservation Indian were violated when the state collected a tax from her which it had no jurisdiction to impose.

*Id.* at 181, 93 S.Ct. at 1267 (quoting *Williams v. Lee*, 358 U.S. at 220, 79 S.Ct. at 270); *see also Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d at 594.

We conclude that because of the potential effect of the garnishment on Begay's livelihood on the reservation and the fact that the Navajo Tribe has chosen to provide alternative remedies for executing on judgments against reservation Indians, the state court action of issuing a writ of garnishment against Begay's wages has been preempted and will infringe upon Navajo tribal sovereignty. The justice court was therefore without jurisdiction to issue the writs of garnishment, and the superior court's holding to the contrary is reversed.

## PERSONAL JURISDICTION IN THE UNDERLYING ACTION

■ Begay also argues that the $450 judgment in Case No. 1202 SC is void for lack of personal jurisdiction because service of process by registered mail was improper.[3] Citing *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976), he maintains that Arizona has no authority to utilize its service of process laws on an Indian reservation, and that a more recent Arizona Supreme Court case, *Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 772 P.2d 1104 (1989), which limited *Francisco*'s scope, was incorrectly decided. Instead, he urges that traditional principles concerning personal jurisdiction and Indian law must be applied.

In *Francisco* the Arizona Supreme Court held that a deputy sheriff did not have the authority to personally serve process on an Indian on a reservation. 113 Ariz. at 431, 556 P.2d at 5. The court explained that

---

2. Begay claims in his opening brief, at page 4, paragraph 12, that he received his paychecks on the reservation, without citation to the record.

3. Begay apparently concedes that he waived this defense in Case No. 1308 SC by failing to raise it in justice court.

"Arizona has no authority to extend the application of its laws to an Indian reservation." *Id.*

Subsequently, in *Dixon,* the question was whether service of process by certified mail on a corporate Indian defendant on a reservation could be accomplished under the "long-arm" provisions of rule 4, Arizona Rules of Civil Procedure. In discussing the holding in *Francisco,* the court noted that it "did not mean to create a 'force-field' around Indian reservations through which no Arizona civil process could pass 'regardless of the cause of action or fairness of the forum....' " *Dixon v. Picopa Constr. Co.,* 160 Ariz. at 260, 772 P.2d at 1113 (citation omitted). The court explained further:

> We merely held [in *Francisco* ] that a *state officer* could not officially serve process on an Indian reservation just as that state officer could not officially serve process in California or New Mexico. *Francisco* does not hold that other forms of service are ineffective on a reservation.... *Francisco* does not invalidate the service of process here. Providing they have subject matter jurisdiction, if Arizona courts have power to authorize service of Arizona civil process in foreign countries, *see* Rule 4(e)(6), surely they have power to extend service of Arizona civil process to defendants located on Indian reservations.

*Id.* (emphasis in original). As further justification, the court stated: "An Indian corporation, not performing tribal functions and thus lacking immunity, cannot leave the reservation, commit a tort, and then retreat back to the reservation to escape service of process. Justice demands and due process permits Arizona's long-arm rules to apply." *Id.* at 259, 772 P.2d at 1112.

Begay contends that the *Dixon* court failed to consider that federal preemption bars the assertion of personal jurisdiction by a state court over Indians residing on an Indian reservation. *See Francisco v. State,* 113 Ariz. 427, 556 P.2d 1. Whether or not this is true, this court is bound to follow precedent set forth by the Arizona Supreme Court. Any changes to the law promulgated by that court, if warranted, must be left to that court. Here, the law in *Dixon* mandates the conclusion that because the justice court had subject-matter jurisdiction over the underlying actions and service was accomplished by registered mail on Begay, the court acquired personal jurisdiction.

Begay also argues, for the first time on appeal, that nothing in the record indicates that Specht complied with rule 4(e)(1), Arizona Rules of Civil Procedure. This court does not, however, consider new issues raised for the first time on appeal. *Stratton v. Inspiration Consol. Mining Co.,* 140 Ariz. 528, 530, 683 P.2d 327, 329 (App. 1984).

## WAIVER OF DEFENSE OF LACK OF PERSONAL JURISDICTION

In light of our conclusion that the justice court had personal jurisdiction over Begay in the underlying actions, it is immaterial whether or not he properly raised and maintained the defense that the court lacked personal jurisdiction. We therefore find it unnecessary to address this issue.

## CONCLUSION

The justice court had both subject-matter and personal jurisdiction in the underlying actions, therefore rendering the judgments valid. The superior court's holding in this regard is affirmed. The justice court, however, did not have jurisdiction to garnish wages earned by the defendant, Begay, on the reservation because of the infringement on tribal sovereignty and the fact that such proceedings have been preempted by tribal law. The superior court's holding to the contrary is accordingly reversed and this matter is remanded to the superior court to enter an order, consistent with this opinion, quashing the writs of garnishment.

SHELLEY and VOSS, JJ., concur.